252 N.J. Super. 369 (1991)
599 A.2d 960
STATE OF NEW JERSEY, PLAINTIFF,
v.
RICHARD CHARLES WILLIAMS, DEFENDANT.
Superior Court of New Jersey, Law Division Somerset County.
Decided August 5, 1991.
*371 Anthony G. Simonetti for plaintiff (Robert J. Del Tufo, Attorney General of New Jersey, attorney).
Lynne F. Stewart for defendant.
IMBRIANI, P.J.Cr.
This case involves the admissibility of DNA and Gm/Km blood tests. The purpose of this hearing is to determine the scientific reliability and, hence, the admissibility of these tests.[1]
Blood consists of three parts, red blood cells, white blood cells, and plasma, and to thoroughly compare blood obtained from two sources, it is essential to analyze each part. For many years scientists have been able to identify the enzyme genetic markers contained in and on red blood cells by electrophoresis, and these test results have routinely been admitted in evidence. See State v. King, 215 N.J. Super. 504, 518-520, 522 A.2d 455 (App.Div. 1987). Defendant does not dispute the validity of this test.
For several decades scientists have been able to analyze plasma with the use of a Gm/Km test which reveals the presence of Gamma markers (Gm) and Kappa markers (Km). Although defendant does not dispute the validity of this test, *372 we must nonetheless determine whether it is scientifically reliable since no court in New Jersey has ever addressed this issue.
A test to analyze white blood cells has been available for several years (see infra), but its requirement of a large specimen for analysis has frustrated its widespread use for forensic purposes. However, recent research in the structure and function of deoxyribonucleic acid (DNA) has revolutionized our knowledge of molecular biology and genetics which, it is claimed, now offers a scientifically reliable method to identify from minute specimens the characteristics of white blood cells with the use of a DNA test.
The purpose of this hearing is to determine whether DNA and Gm/Km tests have attained sufficient scientific reliability to permit their admissibility.[2]
The need for these tests arose out of events that occurred on December 21, 1981, when New Jersey State Trooper Philip Lamonaco was fatally shot by the occupants of a Chevrolet Nova which he stopped on Route 80 West near the Delaware Water Gap. Before being fatally wounded, Trooper Lamonaco managed to fully discharge his revolver and shatter the windshield of the Nova. Several hours later the Nova was located abandoned several miles away. Blood was observed on the front passenger's seat, headrest and door panel. Swabbings of the blood were collected from the vehicle at the time the crime occurred and have been preserved by the State in a frozen condition.
In the summer of 1990, almost nine years later, the frozen blood swabs were analyzed and later compared with the use of DNA and Gm/Km tests to blood extracted on March 4, 1991 pursuant to a court order from defendant Williams, and codefendant, *373 Thomas Manning. The test results positively exclude Manning as the source of the blood found in the Nova, but are consistent with the blood characteristics of defendant. Both men were previously tried for the murder of Trooper Lamonaco. Manning was found guilty of murder, but the jury was unable to reach a verdict as to Williams and this re-trial ensues.
At the outset, it is important to understand that the blood tests performed in this case do not positively identify the person who is the source of the blood spots removed from the Nova. This is unlike a fingerprint analysis which can identify the person who committed a crime because no two fingerprints are alike and, if a person has the same fingerprint as was found at the scene of a crime, this is sufficient evidence to support a conviction. Roesch v. Ferber, 48 N.J. Super. 231, 239, 137 A.2d 61 (App.Div. 1957).
Blood tests performed in this case can only indicate the percentage of the Caucasian population who possess the same blood characteristics as are contained in the blood specimen obtained from the Nova. Defendant is a Caucasian. The State will offer population frequency data indicating that Caucasians who have the same characteristics as found in the blood spot removed from the Nova are as follows: (1) 2.9% possess the same DNA characteristics, (2) 33 1/3% possess the same Gm characteristics, and (3) 13% possess the same enzyme markers. By using a mathematical theorem known as the product rule, the State contends that the frequency of occurrence of all the blood characteristics found in the blood spot removed from the Nova existing in one person is only one out of every 800 members of the Caucasian race, or 0.1244%. Since only about one billion of the five to six billion people on earth are Caucasians, it can be mathematically be determined that approximately 1,250,000 Caucasians have the same blood characteristics as *374 exist in the blood removed from the Nova.[3]
At first blush it would appear that the value of this evidence is minimal. Maybe so. But perhaps not. We know that other human characteristics are routinely admitted in evidence, such as age, weight, height, and color of hair and eyes, even though they are possessed by a large percentage of the population and no one factor can positively identify the person who committed the crime. Nonetheless, we allow such evidence so that the jury can compare the physical characteristics possessed by the person who committed the crime with those of defendant and determine for themselves what weight, if any, to give to the similarities. As was said in State v. Beard, 16 N.J. 50, 106 A.2d 265 (1954), where the trial court admitted evidence that defendant's clothing contained Type O blood, as did blood of the victim and blood found in soil at the scene of the crime:
[n]o one circumstance alone would be sufficient to prove the defendant guilty of the crime laid against him, but each fact, taken in connection with others as constituting a chain of circumstances tending to corroborate the State's case and to support the inference that the accused was the person who committed the crime, was admissible in evidence. [at 58-59, 106 A.2d 265]
Since DNA and Gm/Km tests have never been allowed in evidence in New Jersey, we must first ascertain the standards for the admissibility of newly developed scientific tests. They are now well defined. It was first observed in Frye v. United States, 293 F. 1013 (D.C. Cir.1923) that:
[j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential forces of the principles must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. [at 1014; emphasis supplied]
*375 This test has been essentially adopted by most state courts, including New Jersey, which admits the results of newly developed scientific tests when they have attained:
a sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of truth. [State v. Cary, 49 N.J. 343, 352, 230 A.2d 384 (1967)].
Reliability is "demonstrated by showing that the scientific technique has gained general acceptance within the scientific community". Romano v. Kimmelman, 96 N.J. 66, 80, 474 A.2d 1 (1984).
This is not to suggest that our responsibility is simply one of scientific "nose counting," which some have suggested is a defect of the Frye test. Rather we must determine whether the test has a sufficient foundation of reliability so that it can assist the jury to determine a fact in issue. There is no requirement that the new technique be perfect. Indeed, Romano stated that:
Scientific acceptability need not be predicated upon a unanimous belief or universal agreement in the total or absolute infallibility of the techniques, methodology or procedures that underlie the scientific evidence. [96 N.J. at 80, 474 A.2d 1]
The factors which are relevant to determine reliability and which we have considered are the following:
1. the care with which a scientific technique has been employed;
2. the existence of standards upon which the results of qualified experts may be judged;
3. the quality control techniques that are available to assure the integrity of the tests results, such as the use of frequent "blind tests";
4. the anticipated rate of error inherent in the testing process;
5. the education, training and experience of the proponents of the proposed technique;
*376 6. the lack or absence of testimony or evidence contesting the reliability of the new technique;
7. the existence of a considerable body of literature dealing with the offered technique; and
8. the number of tests which have been conducted with the use of the new technique.
There are three methods of proving the general acceptance of a newly discovered scientific principle or theory: (1) expert testimony, (2) authoritative scientific and legal writings, and (3) judicial opinions. State v. Kelly, 97 N.J. 178, 210, 478 A.2d 364 (1984). The burden is on the proponent to "clearly establish" each of these methods. Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 378, 522 A.2d 405 (1987).
We say without any embarrassment or apology that the evidence offered by the State at this hearing was the most complex scientific testimony which this court has heard in 15 years on the trial bench. We did not fully understand every aspect of the testimony offered. But it is not necessary that the court fully understand the intricate theories and scientific principles which underlie a scientific procedure. Indeed, the reason we receive expert testimony is because it concerns a subject matter which is "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." State v. Kelly, supra, 97 N.J. at 208, 478 A.2d 364. In this regard the court is a layperson.
Consequently, it is not necessary for the court or jury to thoroughly understand and appreciate all of the nuances of the new principle or theory underlying these tests. Indeed, it may well be that some jurors will not fully understand the scientific testimony. But this is not necessary. If it were, many scientific theories that we now accept in court as a matter of course would be rejected, such as theories as to causation of an injury to death, psychiatric or psychological basis of certain conduct by an individual, and others.
*377 The test of admissibility of a new scientific technique or principle is not whether laypersons can fully understand them, but whether it has gained scientific acceptance by those who specialize in the particular field in which it belongs. It may well be that a juror will refuse to accept scientific testimony which it cannot understand; however, that does not affect admissibility but only the weight that such testimony will be given. The court only determines whether expert testimony is admissible, but the "weight to be accorded to such testimony [is] a matter for the jury". United States v. Licht, 158 F.2d 458 (2 Cir.1946).
DNA, which is the basic genetic material contained in almost every living cell, is stored in chromosomes. Every human cell (other than reproductive cells and sperm cells) contains a complete set of 46 chromosomes, half inherited from each parent, which constitute a blueprint for the entire body.
The DNA molecule is arranged as a double stranded structure that resembles a spiral ladder. It is organized into units known as genes, which is a unit of heredity. The nucleus of each human cell contains thousands of genes, which define the essence of each person, and scientists can select a single set of genes from two sources for comparison.
The theory upon which DNA testing is based is that:
1. DNA is located within each cell with a nucleus possessed by a human, whether in the hair, blood, sperm or any other part of the body.
2. The structure of the DNA of a person is identical throughout the person's body.
3. The structure of the DNA within a person's cell is constant throughout the life of the person; i.e., it is identical at both birth and maturity.
4. No two individuals, other than identical twins, have identical DNA.
*378 5. Neither time nor environmental insults will alter the sequence in the structure of DNA.
The goal of the forensic biologist is to determine whether blood obtained from the scene of a crime could have originated with the accused. If the tests reveal that the blood characteristics do not match, it can be said with certainty that they did not originate with the accused. But if they do match, common origin is possible. However, common origin is not useful unless its probability can be limited to a small percentage of the particular population group to which the accused belongs. Thus, there are two essential requirements in forensic DNA testing:
1. the ability to match the blood of an accused with blood found at the scene of a crime; and
2. a method to fairly calculate the statistical probabilities of that match within a designated population group.
Obviously the smaller the included population group, the greater will be the weight that could be given to the results.
We will first examine the Gm/Km test. Scientists are able to identify Gamma markers and Kappa markers in plasma which has been converted into serum by clotting and drying. There appears to be no disagreement in the scientific community regarding the reliability of Gm/Km testing. Indeed, defendant concedes its validity and contests only the method utilized to conduct the test in this case. Its reliability has been established for decades and has been used for medical diagnostic purposes in the United States since at least 1976. The expert witnesses presented by the State, who have worked with both Gm and Km for at least 25 years, testified that Gm/Km testing is fully accepted and established in the sciences of immunology and genetics. Those experts were Dr. Moses Schanfield, Director of the Analytical Genetic Testing Center in Denver and Brian Wraxall, Chief Forensic Serologist at the Serological Institute in California, who conducted the Gm/Km test in this case. Defendant attacked Wraxall's ability and credibility.
*379 Wraxall has worked in forensic serology for 28 years, completed thousands of Gm/Km tests, and has been accepted as an expert witness in forensic serology in over a dozen different states, including New Jersey. His credibility is assailed because he is involved in an unrelated civil law suit in which some unpleasant things have been said about him (all of which he vehemently denied) and by statements made about him by persons who did not testify in this hearing. However, we had the opportunity to examine his curriculum vitae, observe him in court, and listen to his testimony and we are fully satisfied that he possesses a tremendous amount of knowledge and experience in the field. We find his testimony and that of Schanfield to be credible and persuasive. The evidence presented has clearly and convincingly proven that Gm/Km testing has gained general acceptance in the scientific community for the particular field in which it belongs. For this reason, evidence of the Gm/Km tests will be admitted in this trial.
The final and most recently developed blood test is the DNA test of the white blood cells. It is this test which defendant vigorously disputes. At the present time there are two methods of analyzing DNA. One is the restriction-fragment-length-polymorphism technique (RFLP) and the other is the one now before the court, the polymerase-chain-reaction technique (PCR). The RFLP technique has been in use for some time and admittedly attains more discriminating results. However, it suffers from several weaknesses: its high costs, its complexity and difficulty of interpretation, and, of great significance to the forensic scientist, the fact that it requires large and non-degraded specimens for analysis, which frequently are not available.
The scientific community has been searching for many years for another DNA test which is without these shortcomings. The recent development of the PCR technique appears to be the answer, not only because significantly smaller biological samples are needed to perform the test, but because it is relatively *380 inexpensive and its results are easy to interpret. It is generally accepted that RFLP can limit the spectrum of potential donors of a blood specimen to one out of every 10 million persons and, although PCR advocates contend that in the optimum case results can limit the potential population to one out of every 100 persons in a particular population group, in this case it can be limited only to one out of every 800 persons in such group.
The PCR technique was developed in 1985 by Cetus Corporation, which developed an inexpensive kit that has a simplified procedure to amplify a specific region of DNA in a sufficient quantity to allow for its analysis. In a matter of hours a targeted segment of DNA can be amplified in exact replicas a millionfold which can then easily be analyzed. A scientist can select any section of interest from a DNA molecule, typically a single set of genes, and amplify only that part. The result is that fragments of DNA formerly too small to analyze can now be amplified and easily analyzed. Currently there is only one PCR based genetic marker system commercially available for forensic analysis, which is the HLA DQ alpha test system produced by Cetus Corporation.
It really is unnecessary for this court to recite in detail how the HLA DQ alpha typing system works except to note that a person's genotype is detected by what is called a reverse dot blot method. The significant advantage of this system is that it is easy to standardize its results, which removes the risk of typing errors. Indeed, those using the PCR technique are constantly subjected to "blind" testing to measure the accuracy of the results and they have been almost unanimously positive. The few occasions when misidentification occurred has always been attributed to human error and not to any problem or defect in the procedure itself.
The State offered an array of experts in molecular biology and genetics with unimpeachable credentials. All had authored and published countless articles about the PCR technique. They all opined that the PCR technique has gained the general *381 acceptance of scientists in the particular field in which it belongs.
The range of expert testimony offered by the State included Dr. Henry A. Erlich, Director of the Human Genetics Department at Cetus Corporation, Dr. Haig H. Kazazian, Director of the Center for Medical Genetics at John Hopkins University, School of Medicine, Dr. Dennis R. Pontani, a research scientist with the New Jersey Department of Health, who specializes in biology, Dr. David H. Bing, Scientific Director of the Center for Blood Research Laboratories, which is affiliated with Harvard Medical School in Boston, and Dr. Henry C. Lee, forensic scientist and Director of the Connecticut State Police Forensic Science Laboratory. The test itself was conducted by Dr. Edward T. Blake, a forensic serologist at the Forensic Science Associates Laboratory in California, who has conducted thousands of forensic examinations and testified as an expert hundreds of times in state and federal courts in over one-half the states, including about 20 to 25 times an expert witness on DNA, PCR and DQ alpha techniques.
These highly qualified scientists testified to the overwhelming acceptance within the scientific community of PCR-amplified DNA testing. Each was fully familiar with the scientific requisites and proper protocol needed to obtain reliable results and, after reviewing Blake's protocol, bench notes and results in the instant case, found his experimental design to be excellent and his results highly reliable. Indeed, every caution derived from the experience of molecular biologists and forensic scientists was included in the testing method performed by Blake. All agreed that Blake's procedure in typing the forensic sample prior to receipt of the reference samples, dividing and saving half of the forensic sample so that the defense could produce its own test results, running more than one test on the forensic sample for comparison purposes, and in simultaneously typing both positive and negative controls, does provide scientifically accurate and reliable results.
*382 The literature authored and published by those individuals is imposing. For instance, the number of articles which each witness has either written or played a role in publishing are as follows: Dr. Henry A. Erlich, over 100; Dr. Haig H. Kazazian, over 200; Dr. Dennis R. Pontani, over 12; Dr. David H. Bing, over 50; Dr. Henry C. Lee, over 150; and Dr. Edward T. Blake, over 75. Many of their recent articles deal with the reliability of PCR testing techniques.
In addition, it was shown that there are at least two dozen courts that have ruled favorably upon the reliability of PCR tests.
Against this imposing array of evidence and testimony from the leading molecular biologists and geneticists in the nation, defendant did not offer a single witness in opposition. His objection is rooted in the opinions of two or three courts that have questioned the PCR tests and factors elicited in cross-examination of the State's witnesses. In addition, defendant contends that since the PCR test was developed and is marketed by a private, profit-seeking corporation, Cetus Corporation, and the State's witnesses either are employed by or have a very close relationship with Cetus, the "economic realities [of this relationship] can skew scientific opinion and cause a witness to misinterpret the readiness of his technique  i.e., to push it from experimental to demonstrable prematurely."
As the court recalls the testimony, only one witness, Erlich, was actually employed by Cetus, two witnesses, Blake and Kazazian, had a consulting relationship with Cetus, but all of the others had no relationship with Cetus.
The State contends that simply because learned experts earn a living with their expertise should not prohibit the admissibility of their opinions. Evidence of the financial rewards that a witness or a corporation with whom he is associated will gain from the use of the new scientific technique will surely be presented to the jury which can determine what weight, if any, to give to the testimony of each expert.
*383 The record contains an abundance of evidence offered by the State supporting its contention that PCR testing has gained general acceptance in the particular field in which it belongs. Its reliability has been proven pursuant to the standard of State v. Kelly, supra, 97 N.J. at 210, 478 A.2d 364, by the testimony of experts, by evidence of hundreds of authoritative scientific articles and other literature supporting this testing technique, and by the overwhelming acceptance of PCR testing in dozens of judicial decisions in other states throughout the nation.
This court is very cognizant of the danger of admitting scientific evidence which is not proven to be reliable because, as we said in D'Arc v. D'Arc, 157 N.J. Super. 553, 385 A.2d 278 (Ch.Div. 1978):
Scientific evidence ... has the potentiality to be assumed by many jurors as being conclusive and dispositive. [at 565, 385 A.2d 278]
All too frequently jurors are awed and swayed by scientific evidence because, as said in United States v. Addison, 498 F.2d 741 (D.C. Cir.1974), "scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen." Id. at 744.
Nonetheless, in the face of such overwhelming and persuasive testimony and evidence, this court concludes that the State has clearly and convincingly proven that the PCR testing has gained general acceptance in the particular field in which it belongs and, accordingly, testimony of this testing technique is admissible.
NOTES
[1] These tests also permit the identification of other parts of the human body, especially semen, but we will limit ourselves in this opinion to blood.
[2] State v. Thomas, 245 N.J. Super. 428, 436, 586 A.2d 250 (App.Div. 1991) stated that there is a "possibility, if not a probability, that DNA testing can now put to rest the question of defendant's guilt" but that observation appears to have been made without the benefit of a R. 8 hearing in a trial court.
[3] Population frequency data is admissible, State v. Harvey, 121 N.J. 407, 431, 581 A.2d 483 (1990), but does not affect the reliability of tests. It goes only to the weight the jury may give to this evidence.