### WILLIAMS

v.

### AMERICAN CYANAMID and United States.

Civil Action No. 94–920 (JCL).

United States District Court,
D. New Jersey.

June 20, 1995.

Order Modifying Decision and Denying Reconsideration Sept. 8, 1995.

Lee A. Solomon, Law Offices of Lee A. Solomon, Haddon Heights, NJ, for plaintiffs.

John M. Cooney, Anderson, Moss, Parks & Sherouse, Miami, Florida.

Susan C. Cassell, Office of U.S. Attorney, Newark, NJ, for defendants.

Donald A. Robinson, Robinson, St. John & Wayne, Newark, NJ, for defendants.

Nicole M. van Ackere, Donovan, Leisure, Newton & Irvine, New York City.

Rupert Mitsch, Senior Trial Attorney, U.S. Department of Justice, Washington, DC, Christopher Johnson, Donovan, Leisure, Newton & Irvine, New York City, for defendant.

HEDGES, United States Magistrate Judge.

### INTRODUCTION

Plaintiffs have requested permission to conduct polymerase chain reaction ("PCR") tests on certain monopools of defendant American Cyanamid's Orimune® live oral polio vaccine in order to determine whether HIV–1, HIV–2 or SIV retroviruses are present in these monopools. In support of their request plaintiffs have submitted a proposal outlining the procedures they intend to follow in conducting the PCR tests.

American Cyanamid objects to the discovery and testing of the monopools and also objects to the scope of plaintiffs' testing and the adequacy of the proposed procedure. Defendant United States, in a separate response, does not object to the discovery of the monopools, but does object to the scope of testing and the adequacy of testing procedure.

### FACTS

In 1982, between the months of April and August, the infant plaintiff Whitney Williams ingested three doses of Orimune®, an oral polio vaccine manufactured by American Cyanamid. Since 1977, Orimune®, which is manufactured under license from the Center for Biologic Evaluation and Research of the Food and Drug Administration, has been ad-

ministered orally to nearly every infant born in the United States.[1] The live polio virus which forms the basis of Orimune® is grown by American Cyanamid in the kidney cells of African Green Monkeys.

In March 1992, Whitney was diagnosed with Acquired Immune Deficiency Syndrome ("AIDS"), an infectious, blood-borne and fatal disease for which there is no cure. On February 25, 1994, plaintiffs commenced this products liability action against American Cyanamid on the theory that Whitney contracted AIDS from a viral contaminant present in the Orimune® she consumed in 1982. The Complaint was amended to add the United States as a defendant.

Plaintiffs allege in the Complaint that retroviruses, including the Human Immunodeficiency Virus ("HIV"), present in the kidney cells of the African Green Monkey were introduced into Orimune® through the live polio virus growth process. These viruses, plaintiffs allege, were transmitted to Whitney when she consumed the vaccine and resulted in her contraction of AIDS.[2] In the course of discovery samples of Whitney's blood were obtained and polymerase chain reaction ("PCR") and nucleotide sequence tests performed upon them. These tests revealed that Whitney was infected with the HIV–1 strain of the HIV virus.[3] Discovery revealed that American Cyanamid maintains monopool samples for each lot of Orimune® produced, including the lots which originated the doses ingested by Whitney.[4] Plaintiffs wish to perform PCR tests on these lots to determine whether or not any of three strains of retrovirus—HIV–1, HIV–2, or Simian Immunodeficiency Virus ("SIV")[5]—are present.

1. Children typically receive doses of oral poliovirus vaccine at 2 months, 4 months, 6 to 18 months, and prior to entering school.

2. HIV is generally recognized as the virus which causes AIDS.

3. In particular, Whitney is infected with the B clade (branch) of HIV–1 viruses, which is most commonly found in patients in the United States.

4. The lots and their monopools are: Trivalent vaccine lot no. 2044–110C, control no. 658–503: 1–243, 2–271, 3–474, 3–475 and 3–478; lot no.

## DISCUSSION

Under Rule 34(a) a party may request to test or sample tangible things which constitute or contain matter within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served. Rule 26(b)(1) provides that a party may obtain discovery "regarding any matter ... which is relevant to the subject matter involved in the pending action." The rule also provides that the non-admissibility at trial of the information sought shall not act as a bar to discovery as long as the information "appears reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b)(1). While relevancy under Rule 26 is to be construed liberally, *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 391–92, 91 L.Ed. 451 (1947), it is also determined and limited by the context of the facts and circumstances of each particular case. *Continental Access Control Sys., Inc. v. Racal–Vikonics, Inc.*, 101 F.R.D. 418, 419 (E.D.Pa.1983). As the precise boundaries of relevance under Rule 26 depend on the context of the action, *Mallinckrodt Chem. Works v. Goldman, Sachs & Co.*, 58 F.R.D. 348, 352–53 (S.D.N.Y.1973), the determination of relevance is within the court's discretion. *O'Neal v. Riceland Foods*, 684 F.2d 577, 581 (8th Cir.1982); *Bowman v. General Motors Corp.*, 64 F.R.D. 62, 69 (E.D.Pa.1974).

The subject matter of this litigation is whether a retrovirus was present in the Orimune® consumed by Whitney and whether, once consumed, the virus resulted in her infection with HIV–1. Plaintiffs contend that the testing of the monopools for the presence of HIV–1, HIV–2, and SIV is essential to their ability to show both that Whitney was

2044–113A, control no. 670–548: 1–246, 2–269, 2–271 and 3–479; and, lot no. 2084–4452F, control no. 679–572: 1–242, 1–244, 1–245, 1–246, 2–269, 2–270, 2–271, 3–475, 3–478, 3–479 and 3–480.

5. As its name implies, SIV is the simian, or monkey, strain of immunodeficiency viruses. SIVagm is the strain of SIV which exists in African Green Monkeys.

exposed to a virus and that the exposure led to her infection.

■ Defendants object to plaintiffs' request as irrelevant. In particular, defendants question the relevancy of testing for the presence of HIV–2 or SIV. It is undisputed, defendants argue, that Whitney is infected with the HIV–1 strain. The presence of HIV–2 and SIV has no probative value in establishing a causal link, defendants contend, unless HIV–2 or SIV can somehow mutate into HIV–1. Even if SIV had been introduced into Whitney's system, *declare* defendants, it would have been impossible for it to have caused or contributed to Whitney's HIV–1 infection.

In support of their arguments defendants submitted the affidavit of Jonathan Allan, D.V.M., a virologist in the Department of Virology and Immunology at the Southwest Foundation for Biomedical Research. Dr. Allan states that given what is known about the genetic variation between HIV–1 and SIV, it is inconceivable that SIV could mutate into HIV–1. Thus, even if the SIV virus had been present in the vaccine it could not have led to Whitney's infection.

Plaintiffs have not submitted any expert affidavits to contradict Dr. Allan's affidavit. Plaintiffs merely re-articulate their theory that an ingested non–HIV–1 strain could have mutated into HIV–1. Plaintiffs have failed to make any showing that this mutation theory is viable or that the presence of any virus other than HIV–1 is relevant. *See Vardon Golf Co., Inc. v. BBMG Golf Ltd.,* 156 F.R.D. 641, 650–51 (N.D.Ill.1994) (party seeking discovery of inadmissible evidence must establish relevancy by showing that evidence is admissible for another purpose or by articulating a plausible chain of inferences showing how discovery would lead to other admissible evidence). I therefore conclude that discovery of the presence of SIV and HIV–2 is not relevant or reasonably calculated to lead to admissible evidence. *See Uitts*

*v. General Motors Corp.,* 62 F.R.D. 560, 562 (E.D.Pa.1974) (evidence of irrelevancy contained in affidavit of party's expert is sufficient basis to deny discovery when uncontroverted). Even acceptance of plaintiffs' broader theory that SIV was the genetic evolutionary precursor to HIV would not alter my conclusion. Evolution across time and through generations does not equate to mutation within a single life-span.[6]

■ Plaintiffs' request to test the monopools for HIV–1, however, is clearly relevant. That exposure to HIV–1 can result in HIV–1 infection is unquestioned. While Dr. Allan opined as to studies he has done which indicate that it is improbable that African Green monkeys would harbor HIV–1, I am mindful not to equate "improbable" with "impossible" or "inconceivable." Discovery of the monopools for the purpose of performing tests for the presence of HIV–1 will be allowed.

■ American Cyanamid has challenged the admissibility of PCR test results under the general standard for admissibility of expert scientific testimony set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court held that a trial court must determine whether the testimony is (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. A court making this determination should assess the scientific validity of the reasoning or methodology and the applicability of that reasoning or methodology to the facts in issue.[7] 509 U.S. at ——, 113 S.Ct. at 2796. Defendant had objected to the PCR test on the grounds that 1) it is not a methodology that will produce data from which valid scientific conclusions can reasonably be drawn, and 2) the test's known rate of error is so high as to render it unreliable.

---

6. Although it is commonly suggested that humans and simians evolved from a common ancestor, no one suggests that young apes ever grow up to be (or mutate into) humans.

7. Factors to be considered are whether the theory or technique has been tested, whether it has

been subjected to peer review and publication, the known or potential rate of error of a particular technique, and the "general acceptance" of the theory. *Daubert.* The inquiry, however, is to be a "flexible" one. 509 U.S. at ——–——, 113 S.Ct. at 2796–97.

I am satisfied that as a threshold issue the PCR test is not so questionable as to render it *per se* inadmissible. As plaintiffs have pointed out, courts considering the issue under a *Daubert* criterion have found the PCR test admissible. *State v. Grayson,* 1994 WL 670312 at *1, 4–5 (Minn.Dist.Ct. Nov. 8, 1994) (utilizing the *Daubert* standard); *State v. Williams,* 252 N.J.Super. 369, 379–83, 599 A.2d 960, 966–68 (Law Div.1991) (utilizing factors similar to *Daubert* ). Indeed, neither defendant has questioned the scientific validity of the PCR test result which identified HIV–1 as the strain of Whitney's infection.[8]

■ Likewise, American Cyanamid's objection based on the test's potential for generating false positives is best raised at a later date. Although under *Daubert* a court should consider a technique's known or potential rate of error, American Cyanamid must demonstrate that the test possessed more than just its potential for unreliable results for its admission to be barred on those grounds alone. *See State v. Moore,* 268 Mont. 20, 885 P.2d 457, 472–73 (Sup.Ct. 1994). Scientifically reliable results can be obtained from a PCR test when the proper procedures are followed. Should defendants feel that any particular test result is unreliable or the product of contamination, defendants can raise that issue.

American Cyanamid's objection based on the alleged decay of the samples, while novel, also falls short. American Cyanamid offered the affidavit of Mary B. Ritchey, Ph.D.,[9] to attest to the likelihood that the monopools have been subject over the last thirteen years to the natural process of decay which might have altered the biological properties. However, the affidavit does not conclude that the biological properties of the monopools actually changed. American Cyanamid asserts that the monopool's current biological properties are "simply unknown." This does not support the conclusion that the monopools no longer possess the same key qualities as were present at ingestion.[10]

All the parties agree that the failure to take the proper procedural precautions when administering a PCR test greatly increases the risk of obtaining a false positive. Defendants have objected to plaintiffs' proposed PCR testing procedure as insufficient to reduce the risk of contamination to a reasonable level. Plaintiffs have agreed to adopt additional procedures suggested by the United States. Therefore, PCR testing for the presence of HIV–1 will be allowed and the procedure set forth below shall be strictly adhered to.

American Cyanamid shall make available to plaintiffs samples, of a volume not less than 100 μL but not to exceed 500 μL, of the following Orimune® monopools:

Trivalent vaccine lot no. 2044–110C, control no. 658–503: 1–243, 2–271, 3–474, 3–475 and 3–478;

Trivalent vaccine lot no. 2044–113A, control no. 670–548: 1–246, 2–269, 2–271 and 3–479; and

Trivalent vaccine lot no. 2084–4452F, control no. 679–572: 1–242, 1–244, 1–245, 1–246, 2–269, 2–270, 2–271, 3–475, 3–478, 3–479 and 3–480.

Plaintiffs will test the samples in accordance with the procedures set forth in their proposal and with the following conditions:

1. Plaintiffs will utilize three independent laboratories to perform simultaneous tests on the samples. Plaintiffs will not use a laboratory which has previously handled or tested Whitney's blood;

2. Plaintiffs will follow the basic technique of PCR testing described in Persing, D.H., *et al., Diagnostic Molecular Microbiology: Principles and Applications;*

---

**8.** Neither have defendants contended that the test's detection of "discontinuous fragments of a virus genome" in Whitney's blood is not indicative of the presence of a "live" virus.

**9.** Dr. Ritchey is Vice President of Operations for Lederle Praxis Biologicals, the division of American Cyanamid which manufacturers Orimune®.

**10.** American Cyanamid presumably does not know the current biological properties of the monopools because it has not recently done testing. A different conclusion, however, might have been warranted if efforts to determine the current nature of the monopools had yielded a finding that their nature was "simply unknown." This, however, does not appear to be the case.

3. Plaintiffs will test the monopools in laboratory facilities specifically dedicated to this project and the laboratory space, equipment and materials will be subjected to rigorous quality control measures, as set forth in Dragon, E.A., *et al.*, "Quality Control of Polymerase Chain Reaction," *Diagnostic Molecular Microbiology: Principles and Applications* at 160–168. Plaintiffs will use separate laboratory facilities for the various parts of the test (*i.e.;* sample preparation, PCR amplification, post PCR analysis, and nucleotide sequencing, if necessary);

4. To monitor potential contamination of the vaccine monopools from extraneous viruses, an equal number of negative controls (*i.e.;* samples that do not contain viruses) will be interspersed among the test samples. American Cyanamid will: (a) prepare the vaccine samples and the negative controls; (b) blind-code all of the test samples; and (c) provide a battery of blind-coded test samples to each of the laboratories;

5. In the event that any sample(s) test positive for HIV–1 the test will be repeated by the laboratory that originally conducted the test. All laboratories' results will then be forwarded to an independent expert in the field of retrovirus phylogeny and variation, agreed upon by the parties, who will validate the conclusions. If the results from the three laboratories are contradictory and the independent expert is unable to reach a conclusion new samples of the monopool(s) in question will be prepared and distributed to all three laboratories for retesting. In addition, the expert may inspect any or all of the three laboratories to investigate possible explanations of the discrepancy;

6. The results of the testing will be released only after evaluation by the independent expert;

7. Each laboratory will only use the PCR primers from the conserved region of the gag gene for HIV–1. These primers should: (1) bind specifically with retroviral RNA/DNA; (2) not react with cellular RNA or DNA; and (3) amplify sufficiently large regions of the genome to facilitate the acquisition of multiple nucleotide sequences of at least 200–500 bases. These bases should contain a sufficient number of phylogenetically critical sites to facilitate specific identification of the virus genotype and permit a genetic determination of its relationship with other retrovirus isolates;

8. PCR amplifications will be repeated at least twice to confirm the results. Nucleotide sequences should be performed on any positive results;

9. All records of results will be retained so that the results can be reviewed to determine whether the tests were conducted under proper conditions. This includes all original and aligned sequence data.

To the extent that plaintiffs' proposal conflicts with any of the above, the terms I have set forth shall control.

SO ORDERED.

## ORDER MODIFYING DECISION AND DENYING RECONSIDERATION

### *INTRODUCTION*

This matter comes before me on plaintiffs' motion for reconsideration of my June 19, 1995 order denying their motion to test monopools of defendant American Cyanamid's Oral Polio Vaccine for HIV–2 and SIV. I have considered the papers submitted in support of and in opposition to the motion.

### *DISCUSSION*

Motions for reconsideration, governed by General Rule 12I, should be granted only when the Court "overlooked" controlling precedent or dispositive factual matters which had properly been presented by the parties at the time the motion was decided. *Resorts Intern. v. Greate Bay Hotel and Casino, Inc.*, 830 F.Supp. 826, 831 (D.N.J.1992). Matters not originally presented, but which are subsequently submitted in support of the motion for reconsideration will not justify a grant of the motion.[1] *Florham Park Chev-*

1. However, where controlling precedent is handed down in the intervening period between the

*ron, Inc. v. Chevron U.S.A., Inc.,* 680 F.Supp. 159, 162–63 (D.N.J.1988). Likewise, mere disagreement with a decision does not form the proper basis for a motion to reconsider. *Bermingham v. Sony Corp. of America, Inc.,* 820 F.Supp. 834, 859 n. 8 (D.N.J.1992), *aff'd,* 37 F.3d 1485 (3d Cir.1994). Such disagreement is more appropriately addressed through the normal appellate process.

Plaintiffs argue that I overlooked plaintiffs' citation to Myers, G., MacInnes, K., and Kober, B., "The Emergence of Simian/Human Immunodeficiency Viruses", *8 AIDS Research and Human Retroviruses,* 373–386 (1992) when I concluded that the affidavit of defendant United States' expert Dr. Allan was uncontradicted. This article, plaintiffs contend, supports both their theory that Human Immunodeficiency Virus ("HIV") may have arisen from a simian predecessor and that its cross-over from simian to human host may have occurred as recently as 30 years ago.

Plaintiffs, in their original letter submission, utilized the Myers article to support the following propositions:

> The concept that a simian lentivirus originated human AIDS now appears widely accepted. Molecular evolutionary analyses strongly support the theory that human immunodeficiency viruses (HIV) have recently arisen from a diverse pool of nonhuman primate immunodeficiency viruses called simian immunodeficiency virus or SIV. DNA and protein sequence comparisons reveal uncanny similarities among the genetic sequences of HIV and SIV.

Plaintiffs' May 18, 1995 letter at 1–2 (citations omitted). In my opinion I addressed these propositions, stating:

> Even acceptance of plaintiffs' broader theory that SIV was the genetic evolutionary precursor to HIV would not alter my conclusion. Evolution across time and

through generations does not equate to mutation within a single life-span.

June 19, 1995 Letter–Opinion and Order at 4 (footnote omitted). Thus, I considered plaintiffs' propositions and their citation to Myers in determining plaintiffs' original request.[2] As I did not overlook any controlling precedent or dispositive factual matter which had properly been before me, plaintiffs' motion for reconsideration is **DENIED.**

However, I do recognize that the language utilized in my opinion could lead to confusion and possible misinterpretation. To the extent that plaintiffs' motion for reconsideration is based upon a reading of my opinion that inadvertently arises from my use of imprecise language, I believe that clarification and amendment is appropriate. *See Easton & Co. v. Mutual Benefit Life Insurance Co.,* 1994 WL 248178 (D.N.J.1994).

Plaintiffs have read my opinion to hold that no strain of simian immunodeficiency virus ("SIV") could ever evolve, through any process or across any length of time, into HIV–1. It was not my intent that the opinion be so read. As I noted in footnote 5, SIVagm is the strain of SIV which exists in African green monkeys, the species which plaintiffs contend is the source of the infant plaintiff's infection. My utilization of the acronym "SIV" was intended in the context of SIVagm, not SIV *in toto.* To avoid further confusion, all references in my June 19 opinion to "SIV," except that in footnote 5 and in the second full paragraph of page 4, are hereby modified to "SIVagm."

This modification, however, does not alter my final holding. Indeed, I note that there is nothing inconsistent between my opinion, as modified, and the Myers article (nor between the article and the portions of the Allan affidavit upon which my opinion rests). While the article supports plaintiffs' proposition that HIV–1 may have arisen through an

---

original decision and the motion for reconsideration, reconsideration is proper. *See Pelham v. United States,* 661 F.Supp. 1063, 1065 (D.N.J. 1987).

2. Plaintiffs have attached the text of the Myers article which was not attached to their original letter submission. It is suggested that I not only overlooked the citation to the article itself, but

that I overlooked its "findings." The only of the article's "findings" argued before me were those set forth in plaintiffs' letter submission. That the article elaborates further on these "findings" then plaintiffs chose to do in their submission does not mean that I failed to consider those findings, nor that plaintiffs are entitled to reconsideration because of their failure to elaborate.

evolutionary process and across a span of decades from a SIV precursor nothing in the article supports plaintiffs' theory that SIVagm introduced into a single human host could therein mutate into HIV–1. Indeed, the article itself concludes that HIV–1 did not evolve, much less mutate, from SIVagm. *Myers, et al.* at 375. Even accepting the article's suggestion that HIV–1 and SIVagm may have evolved separately from a common ancestor, the article still argues that the evolutionary process took 30 years at a minimum. Nowhere in the article is it suggested that such an evolution occurred within the same host.

Testing of the monopools for HIV–1 under the conditions set forth in my previous order is to be completed by 60 days from the date hereof.

**SO ORDERED.**