# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2574-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JEROME BOYNTON,

      Defendant-Appellant.

_____

        Submitted May 17, 2021 – Decided September 13, 2021

        Before Judges Sabatino, Gooden Brown and DeAlmeida.

        On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 15-11-2015.

        Joseph E. Krakora, Public Defender, attorney for appellant (John P. Flynn, Assistant Deputy Public Defender, of counsel and on the briefs).

        Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Lisa Sarnoff Gochman, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant was convicted of second-degree sexual assault, N.J.S.A. 2C:14-2(b), and third-degree child endangerment, N.J.S.A. 2C:24-4(a). He was sentenced to an aggregate term of ten years' imprisonment, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4, and restrictions under Megan's Law, N.J.S.A. 2C:7-1 to -23.

The convictions stemmed from an incident during which defendant had sexual contact with a seven-year-old girl, L.M.,[1] in a house occupied by several related and unrelated individuals. At trial, the State produced the victim who recounted the incident, the victim's videotaped statement elicited during a forensic interview pursuant to the tender years exception, N.J.R.E. 803(c)(27), defendant's statement following the administration of his Miranda[2] rights denying the allegations, and DNA evidence that could not exclude him as a suspect.

On appeal, defendant raises the following points for our consideration:

---

[1]  We use initials to protect the confidentiality of victims. R. 1:38-3(c)(11).

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

POINT I

THE TRIAL COURT DEPRIVED [DEFENDANT] OF A FAIR TRIAL BY ADMITTING [THE VICTIM'S] FORENSIC INTERVIEW PURSUANT TO N.J.R.E. 803(C)(27) BECAUSE THE STATEMENT WAS NOT TRUSTWORTHY.

POINT II

THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING CONFUSING EXPERT TESTIMONY WITH LIMITED PROBATIVE VALUE REGARDING Y-STR DNA TESTING. (NOT RAISED BELOW).

A. The DNA Testimony.

B. The Trial Court's Failure To Strike The Y-STR Testimony Under N.J.R.E. 403 Warrants The Reversal Of [Defendant's] Convictions.

POINT III

THE TRIAL COURT DEPRIVED [DEFENDANT] OF A FAIR TRIAL BY FAILING TO REDACT PREJUDICIAL HEARSAY BY THE OFFICERS FROM THE RECORDING OF THE CUSTODIAL INTERROGATION.

A. The Trial Court Failed To Redact Prejudicial Hearsay Implying That [Defendant's] Friends Believed He Committed The Offense.

3

B. The Trial Court Failed To Redact Hearsay That Impermissibly Bolstered [The Victim's] Credibility.

C. Despite The Limiting Instruction, The Prejudicial Hearsay Was Harmful.

POINT IV

THE CUMULATIVE EFFECT OF THE ABOVE ERRORS DEPRIVED [DEFENDANT] OF DUE PROCESS AND A FAIR TRIAL AND WARRANTS THE REVERSAL OF HIS CONVICTIONS. (NOT RAISED BELOW).

POINT V

THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE COURT IMPROPERLY FOUND AGGRAVATING FACTORS AND IMPOSED A SEX CRIME VICTIM TREATMENT FUND [SCVTF] PENALTY WITHOUT ENGAGING IN THE REQUIRED ANALYSIS.

We have considered these arguments in light of the record and applicable legal principles. Other than the imposition of the SCVTF penalty, we reject each of the points raised and affirm.

I.

Following the adjudication of various pre-trial motions, a seven-day jury trial was conducted on various dates in September 2018. We glean these facts from the trial record.

4                                                              A-2574-18

In 2015, then seven-year-old L.M.,[3] her two older brothers, her two older sisters, and her mother needed a place to stay. Floyd Hicks, a family friend, allowed them to stay at his home located in Tinton Falls.[4] On the evening of May 9, 2015, Hicks also allowed some other friends, including defendant, to sleep over.

L.M. testified that while she was in her bedroom at Hicks's house on the night of May 9, she was awakened by someone touching her on her "private part." According to L.M., "[t]he person that touched [her]," who was later identified as defendant, "licked his finger, and . . . put it on . . . [her] private part, and then . . . licked [his finger] again." She specified the person touched her "[u]nder [her] clothing" and his "wet finger" was "kind of inside" her "private part." L.M. said that during the incident, the person asked her if she was "going to tell." When she responded that she would, he left the room. Although L.M. did not know the person's name, she described him as having "poofy hair" and dark skin, a description that matched defendant's physical characteristics. She testified she had seen him "[o]nce or twice" before as "[h]e

---

[3] L.M. was born in January of 2008.

[4] The house was owned by Hicks's godmother.

was living in the basement" at the house. According to L.M., the following morning, she told her brother, A.M., who called their mother at work.

During a forensic interview conducted by Detective Delisa Brazile of the Monmouth County Prosecutor's Office on the afternoon of May 10, L.M. gave a consistent account of what had transpired. The video recorded interview was played for the jury at trial. The jury was also shown the anatomically correct drawings L.M. had marked during the interview, demarcating where she had been touched.

A.M.,[5] L.M.'s brother, testified at trial that he and his brother, J.M., slept in a room on the main floor of the Hicks house. On the morning of May 10, 2015, L.M. came into their room and told them that during the night, "the guy that got us candy," with a "short Afro," and "a beard," had "licked his finger and . . . put it in [her] cooch." She said she told him to stop, but that he did it again before leaving the room. A.M. asked if it was defendant and she responded, "yeah." A.M. then called their mother, N.M., and told her what L.M. had said.

N.M., who was out delivering newspapers when she received the call, spoke to L.M., who was crying "hysterically." N.M. came back to the house with Hicks's sister and called the police after speaking to L.M. again. N.M.

---

[5] A.M. was fourteen years old when the incident occurred.

A-2574-18

testified she had seen defendant at the house the day before and he had told her "he had purchased some snacks for [her] daughters" and "[h]oped [she] didn't mind."

Blake Rutherford, a Sergeant with the Tinton Falls Police Department, responded to the call on the morning of May 10. After speaking to N.M. and L.M., Rutherford and another officer located defendant in the basement of the Hicks house and took him into custody, escorting him outside to a patrol car where a crowd had gathered. Elena Mazzeo-Ignaczak, another Tinton Falls police officer, transported L.M. to the Jersey Shore Medical Center where she underwent a forensic sexual assault examination.

Hicks testified that on the evening of May 9, he was playing cards in the basement with friends. At some point, he went upstairs to the third floor and went to sleep. Talek Lane, a friend of Hicks and defendant, testified he stayed at Hicks's house on the evening in question and slept in the basement. He stated defendant and another person, Parlette Wakefield, slept there as well.[6] According to Lane, at one point late that evening, he and defendant went to defendant's cousin's house in Asbury Park but later returned to Hicks's basement.

---

[6] During his testimony, Wakefield confirmed that he slept in the basement on the night in question.

A-2574-18

After they returned, between 2:30 and 3:00 a.m. on the morning of May 10, defendant went upstairs. A couple of minutes later, Lane went upstairs to the main floor "to get a cigarette" and saw defendant coming "from the back area." Lane described the back area as a hallway that divided the bedrooms on the first floor. Lane went back downstairs to the basement, and, about fifteen minutes later, defendant returned to the basement as well.

After defendant was arrested and transported to police headquarters, he was administered Miranda warnings and questioned by Detective Brazile and Detective Corporal Robert Wilson at approximately 6:00 p.m. on May 10. Defendant's recorded custodial interview was played for the jury during Detective Brazile's testimony.[7] In the statement, defendant, born in 1991, admitted staying at Hicks's house at the time of the incident, admitted buying all the kids snacks the day before, and admitted seeing L.M. "laying in the bed" in her room on the night in question. However, defendant denied going into L.M.'s room or touching her. Defendant maintained his innocence despite Brazile telling him L.M. had been consistent in her account.

---

[7] Defendant does not challenge the admission of his statement, only the trial judge's failure to redact certain portions of it.

Defendant also stated he went from the basement to the first floor twice on the evening in question, once to get water and the other time to get his headphones. When Brazile told him his friends had seen him come upstairs "more than twice," he denied doing so.

During the interview, Brazile told defendant Hicks was "apologizing to [N.M.] about [defendant] being there" and saying he had "checked on the kids" but did not "know [defendant] was down there." Brazile added, "I'm only telling you what your people are telling me" and commented "it's amazing that your boy [Hicks] even believes that you did it." Defendant responded that it was "bullshit" and stated, "everybody [was] throw[ing his] ass under the damn bus."

Debrann Petrizzo, a registered nurse, testified for the State as an expert in forensic sexual assault examinations. She performed an examination on L.M. on the afternoon of May 10 at the Jersey Shore Medical Center. She observed "a little bit of white fluid" on the external genitalia and took a swab of the fluid. She also "swabbed the external genitalia" and took a buccal swab from L.M. for DNA identification and testing.

Allison Lane, a forensic scientist, testified for the State as an expert in forensic serology. She examined the genital specimen collected by Petrizzo as well as L.M.'s clothing. On L.M.'s clothing, Lane detected "amylase," an

"enzyme found in high concentrations in saliva." Lane detected "two areas of the amylase activity" on L.M.'s "underwear," and "two areas" on L.M.'s "T-shirt." Lane submitted these samples along with L.M.'s DNA reference sample for DNA testing.

Christopher Szymkowiak, a forensic scientist, testified for the State as an expert in forensic DNA analysis.[8] He examined the four samples for both autosomal as well as Y-short tandem repeat (Y-STR) DNA. Szymkowiak explained that using autosomal DNA testing, an analyst can conclude that someone is the source of a DNA profile, meaning the analyst is "confident that the individual to the exclusion of all . . . [other] people has left that DNA." In contrast, because Y-STR DNA profiles are not unique to a specific person and will be identical for all males in a "paternal line," an analyst can only conclude that "someone matches a profile" or that "they [are] excluded," but "[cannot] do any source attribution because we know . . . that [the] male line all [have] that same profile."

Based on autosomal DNA testing, Szymkowiak determined L.M. was the sole contributor on one T-shirt sample and the major contributor on the other T-shirt sample, where he identified a mixture of DNA. Szymkowiak explained "a

---

[8] Defendant did not object to Szymkowiak being qualified as an expert.

mixture is a sample where there [is] more than one person present." Regarding the underwear, Szymkowiak determined L.M. was the sole contributor of DNA on one underwear sample and the major contributor on the other underwear sample, where he again identified a mixture of DNA.

After Szymkowiak obtained a reference sample of defendant's DNA,[9] based on autosomal DNA analysis, Szymkowiak excluded defendant as "a possible contributor to the minor DNA profile obtained" from the mixture found on both the underwear and the T-shirt samples. However, Szymkowiak testified "the [Y-STR DNA] profile of [defendant] matche[d] the major [Y-STR] DNA profile obtained" in both underwear samples. Based on the data, Szymkowiak concluded defendant "[could not] be excluded" as a contributor but conceded on cross-examination his conclusion did not have much statistical value in determining whether or not somebody should be included or excluded because "a lot of people could potentially have a match too." Szymkowiak testified further that his testing revealed there was "a second male who had contributed

---

[9] To obtain defendant's DNA, Monmouth County Prosecutor's Office Detective Robert Flanigan took a buccal swab from defendant on December 16, 2015, after the State's application for an order compelling physical exemplars was granted by the trial court on December 11, 2015.

to the DNA . . . found on the underwear" but he had no "reference" sample "to compare that minor profile to."

Defendant did not testify or present any witnesses. His motion for a judgment of acquittal at the close of the State's case, R. 3:18-1, was denied. Following the jury's guilty verdict, defendant moved for a judgment of acquittal notwithstanding the verdict, R. 3:18-2, or a new trial, R. 3:20-1, which was also denied. Defendant was sentenced on January 4, 2019, and a memorializing judgment of conviction was entered on January 9, 2019. This appeal followed.

## II.

In Point I, defendant argues the trial judge abused his discretion in admitting L.M.'s forensic interview because the totality of the circumstances, including outside influences and leading questions, established her "out-of-court statements" were "inherently unreliable." We disagree.

Under N.J.R.E. 803(c)(27), "[a] statement by a child under the age of twelve relating to sexual misconduct committed with or against that child is admissible" if "the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy." Thus, N.J.R.E. 803(c)(27) requires a trial court to make a preliminary finding that an out-of-court statement

12

is sufficiently reliable based on its trustworthiness. State v. D.G., 157 N.J. 112, 128 (1999).

"[I]n making the determination whether a statement offered under the Rule is trustworthy, the trial court should evaluate the 'totality of the circumstances' surrounding the statement." State v. Burr, 392 N.J. Super. 538, 569 (App. Div. 2007) (quoting State v. Roman, 248 N.J. Super. 144, 152 (App. Div. 1991)), aff'd as modified on other grounds, 195 N.J. 119 (2008). Factors for the court to consider "include whether the statement was made spontaneously, whether the account is repeated with consistency, the mental state of the declarant, the use of terminology unexpected of a child of similar age, lack of a motive to fabricate, use of interrogation, and manipulation by adults." Id. at 570. This "list is non-exhaustive, and courts are afforded considerable leeway in their evaluation of appropriate factors." Ibid.

Additional factors related to "improper interrogations" conducted by the State may taint the reliability or trustworthiness of the child's statement. State v. Michaels, 136 N.J. 299, 311 (1994); see D.G., 157 N.J. at 130-34 (applying the Michaels principles to assessing the reliability of a videotaped statement for admission under N.J.R.E. 803(c)(27)). "If a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the

child's responses as an accurate recollection of actual events." Michaels, 136 N.J. at 309. "A variety of factors bear on the kinds of interrogation that can affect the reliability of a child's statements concerning sexual abuse." Ibid.

> [A]mong the factors that can undermine the neutrality of an interview and create undue suggestiveness are a lack of investigatory independence, the pursuit by the interviewer of a preconceived notion of what has happened to the child, the use of leading questions, and a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers.
>
> [Ibid.]

In reviewing a trial court's determination regarding the admissibility of a child's statement under N.J.R.E. 803(c)(27), "the judge's factual findings are entitled to deference" as long as they are "supported by sufficient credible evidence in the record." State v. P.S., 202 N.J. 232, 250 (2010) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). The "determination of reliability or trustworthiness" should not be disturbed "unless the judge's determination amounted to an abuse of discretion." Ibid. An abuse of discretion arises when "the finding is 'clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction . . . .'" Id. at 250-51 (alteration in original) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). "Only in those circumstances may 'an appellate court "appraise the record as if

14

it were deciding the matter at inception and make its own findings and conclusions."'" Id. at 251 (quoting Elders, 192 N.J. at 244).

During the pre-trial hearing conducted on November 29, 2017, Detective Brazile testified that as a veteran member of the Monmouth County Prosecutor's Office's Special Victims Bureau, she had undergone specialized training in conducting forensic interviews of children under the age of twelve. Brazile described a forensic interview as "a semi-structured interview . . . conducted with a child . . . to elicit information about an incident that may have occurred," or that the child "may have witnessed, or . . . may potentially be a victim of." Brazile stated she had conducted "[w]ell over 100" forensic interviews throughout her career within the Special Victims Bureau.

Prior to conducting L.M.'s forensic interview, Brazile was briefed about the allegations by another officer, whom she instructed to have L.M. undergo a forensic sexual assault examination. Immediately following the examination, L.M. was transported along with her mother and brothers to the Child Advocacy Center where Brazile conducted the interview the afternoon of May 10, 2015. The interview was audio- and video-recorded and played for the judge during the hearing.

During the interview, initially, when asked whether "something happen[ed] today or yesterday" that she had "told mommy or . . . someone else about," L.M. responded she had told "mommy." L.M. also acknowledged she had told her brothers about something that had happened to her that she did not like. However, L.M. stated she "forg[o]t what [she] told them." After L.M. identified on an anatomically correct drawing the parts of the body that nobody was supposed to touch and described the vaginal area as her "potty," she was asked whether anyone had "ever touched [her] or tried to touch [her] on any of those parts of the body." At that point, L.M. nodded her head in the affirmative and said it was "one of the boys that [was] in the house." L.M. was then asked whether it was one of the boys that she "call[ed] the man." L.M. replied "[y]es" and said his name was "Jerome." L.M. described Jerome as "[t]all" with "a beard" and "a[n] afro."[10]

When asked to explain what had happened, L.M. proceeded to disclose the incident to Brazile. L.M. told Brazile that while she "was asleep inside of [her] room" the previous night, Jerome had "licked his finger and . . . put it in [her] potty." She added she "woke up when it was happening" and said, "get off

_____

[10] L.M.'s description matched defendant's physical characteristics.

of me" and then "stop it." L.M. stated she was wearing "a green shirt," "pink leggings," and "underwear" at the time. She said that Jerome placed his hand "[i]nside of [her] pink leggings" and "[u]nder [her] underwear," and put his finger "[o]n top of" her "potty."[11] After she told him to stop, Jerome left the room. According to L.M., she "went back to sleep" and told her mother and her brothers the following morning.

L.M. also told Brazile that Jerome stayed at the house a lot and slept in the basement. She stated that Jerome had gotten her and her sister "snacks" the day before. L.M. was then given "an anatomically correct doll" and demonstrated what Jerome had done to her on the doll.

L.M.'s brother, A.M., also testified at the hearing. He stated one morning in May 2015, L.M. came into the room where he and his brother had been sleeping and said, "last night that boy came in the room and he licked his finger and put it in my cooch." L.M. said to A.M. she told the "boy" to stop, but he did it again before leaving the room. When A.M. asked L.M. "who she was talking about," she responded "the guy who got us candy." A.M. asked L.M. "what . . . he look[ed] like," and she responded he had "a short afro and a beard."

---

[11] During the course of the interview, L.M. also stated that Jerome placed his hand "[o]ver" rather than underneath her underwear, and she did not see him lick his fingers but knew he did because her underwear was wet.

A-2574-18

According to A.M., because the only individual in the house who fit that description was defendant, he asked her if it was Jerome, and L.M. responded "yeah."

Following the hearing, the judge granted the State's motion to admit L.M.'s statements at trial and memorialized the decision in an order dated January 18, 2018, that was accompanied by a written statement of reasons. In ruling that L.M.'s statements were "trustworthy" and therefore admissible under N.J.R.E. 803(c)(27), the judge stated that other than arguing "Detective Brazile used improper techniques during the forensic interview,"

> [d]efendant has put forth no argument that L.M.'s statements were unreliable . . . . This [c]ourt viewed the forensic interview of L.M. and heard testimony of L.M.'s brother, A.M., regarding her initial disclosure to him. Based on this evidence, the [c]ourt finds that the statements of L.M. were spontaneous and consistent with the type of statement that would be made by someone her age. Therefore, this [c]ourt finds a probability that L.M.'s statements are trustworthy.

In specifically rejecting defendant's assertion that Brazile had used improper techniques during the interview, the judge reasoned:

> As for [d]efense [c]ounsel's assertion . . . that Detective Brazile used improper techniques during the forensic interview[] because there was a lack of spontaneous recollection, repeated questioning, improper body language and inflection, leading questions, and the use of positive reinforcement, the

18

[c]ourt does not find this assertion to be supported by the current record. . . . Based on [the court] viewing [the video recording of the forensic interview], the [c]ourt does not find that leading questions or improper body language and inflection were used. The [c]ourt did observe Detective Brazile use repeated questioning and positive reinforcement, but [d]efense [c]ounsel did not establish that these techniques, as employed by Detective Brazile, were contrary to proper protocol or in some way coercive.

Similarly, the [c]ourt observed Detective Brazile's use of anatomically correct drawings and dolls during the forensic interview[], but [d]efense [c]ounsel has failed to establish how the use of these drawings or dolls could have corrupted the statements of L.M. . . . . Anatomically correct drawings and dolls are commonly employed by detectives during forensic interviews.

We are satisfied the judge's factual findings are supported by sufficient credible evidence in the record, and his conclusion that the statements were sufficiently reliable to justify admission under N.J.R.E. 803(c)(27) was sound. Contrary to defendant's contention, the judge's findings were not "cursory" but reflected thoughtful consideration of the applicable factors. See State v. Smith, 158 N.J. 376, 389-91 (1999) (holding closeness in time between incident and interview, consistent answers, no evidence of a motive to fabricate the charges, and absence of bias against defendant by interviewer supported determination that the statement was sufficiently reliable to satisfy the trustworthiness requirement of N.J.R.E. 803(c)(27)); see also State v. Delgado, 327 N.J. Super.

19

137, 148 (App. Div. 2000) (finding the child sex assault victim's statements trustworthy and admissible under N.J.R.E. 803(c)(27) because "the statements were spontaneous, made under non-stressful conditions and were consistent").

We also reject defendant's argument that "outside influences" on L.M. prior to the forensic interview weighed against a finding of trustworthiness, influences such as L.M.: (1) being "provided the name 'Jerome'" by A.M.; (2) seeing defendant being taken out of the house and "placed into the back of a police car"; and (3) "likely hear[ing] adults, her siblings, and officers discuss the allegations" during the gathering "outside of the home." Notably, L.M. had identified defendant to A.M. as the perpetrator before the police were even called to the scene. Although L.M. did not know defendant's name, defendant was the only person in the house who matched L.M.'s descriptions.

Likewise, we reject defendant's argument that the statements were unreliable because they were only elicited with the use of "pointed" and "leading questions" by Brazile. "Indeed, the use of leading questions to facilitate an examination of [a] child witness[] who [is] hesitant, evasive or reluctant is not improper." Smith, 158 N.J. at 390. "Due to a child's natural hesitancy around strangers and authority figures, . . . the presence of leading questions in an

20

interview may be necessary and does not automatically make the child's statement untrustworthy." Delgado, 327 N.J. Super. at 147-48.

Furthermore, contrary to defendant's assertion, allowing the recording of the forensic interview to be played for the jury in addition to L.M.'s trial testimony was not unduly prejudicial. See Smith, 158 N.J. at 391 (cautioning that "a trial court should be cognizant of its right under N.J.R.E. 403, to exclude evidence if it finds in its discretion, that the prejudicial value of that evidence substantially outweighs its probative value" (quoting D.G., 157 N.J. at 128)).

III.

In Point II, defendant argues for the first time on appeal that it was error for the judge to permit Szymkowiak's expert testimony regarding the Y-STR DNA testing because the testimony was "riddled with internal inconsistencies." Defendant asserts that "[e]ven in the absence of an objection, the trial court, sua sponte, should have stricken Szymkowiak's testimony" under N.J.R.E. 403 "because [of its] limited probative value" and "risk of confusing or misleading the jury."

Inasmuch as there was no objection at trial, we review for plain error, which is error that "is 'clearly capable of producing an unjust result.'" State v. Singleton, 211 N.J. 157, 182 (2012) (quoting R. 2:10-2). Under the plain error

21

standard, "the possibility of injustice [must be] 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Taffaro, 195 N.J. 442, 454 (2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). When a defendant does not object, our Supreme Court "has held 'to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" State v. Weston, 222 N.J. 277, 294-95 (2015) (quoting Macon, 57 N.J. at 333). Thus, "[i]t is defendant's burden to demonstrate that the trial courts' procedures constituted plain error." Id. at 295. In determining whether the defendant has met his burden, "we assess the overall strength of the State's case." Ibid. (citations and quotation marks omitted).

Defendant contends the improper admission of the Y-STR DNA expert testimony "was clearly capable of producing an unjust result." Y-STR DNA analysis involves the testing of the male Y chromosome, as opposed to autosomal STR DNA testing, which involves the testing of all twenty-three pairs of chromosomes. State v. Calleia, 414 N.J. Super. 125, 143-44 (App. Div. 2010), rev'd on other grounds, 206 N.J. 274 (2011). While Y-STR is not the preferred method of DNA analysis, it "is extremely useful . . . in excluding someone" as a suspect "since an individual cannot be the source of the DNA if

the profiles do not match." Id. at 146-47. "If the Y-STR DNA profiles do match, then all that can be said is that the individual cannot be excluded as the DNA donor." Ibid.

"[T]he strength of Y-STR DNA testing derives from the fact that only males have a Y chromosome." Id. at 146. "[W]hen forensic scientists are confronted with a mixed DNA sample," meaning a sample from two or more individuals, "[a]utosomal STR DNA analysis is problematic. . . ." Ibid.

> An autosomal STR DNA profile generated from the stains will have a combination of both individuals' DNA patterns and it is not possible to attribute which traits go with which person. Further, one individual's profile often overwhelms the other and renders it un-detectible. When one individual is male and one is female, however, it is possible to perform a Y[]-STR DNA analysis and focus solely on the DNA of the male.
>
> [Ibid.]

Unfortunately, the fact that only males have a Y chromosome is also the source of the Y-STR DNA "test's weakness." Id. at 146.

> Because only males possess Y chromosomes, a mother does not contribute to the genetic code of her son's Y chromosome. The DNA sequence on the Y chromosome is passed in complete form from grandfather, to father, to son and on down the male lineage. . . . In other words, barring random mutations, all men in a paternal lineage will possess the same Y[]-STR DNA profile. Thus, fathers, sons, brothers,

23

uncles, and paternal cousins cannot be distinguished from one another through a Y[]-STR DNA profile.

[Id. at 146-47.]

In Calleia, we held Y-STR DNA evidence was "relevant" and "probative" because "it show[ed] that [the] defendant could not be excluded from the class of individuals who could have 'contributed' th[e] biological material" in question. Id. at 150. We concluded that "although th[e] evidence [could not] unequivocally establish that defendant was the person who killed his wife, it [did] show that defendant [could not] be excluded from the class of individuals who could have been the killer." Ibid. We explained the fact that the expert in that case[12] "could not say with certainty that defendant was the source of the DNA [did] not render the test results irrelevant." Id. at 151.

Rather, we noted there were "still sufficient variations within the population to make any particular profile distinct." Ibid. We expounded:

> The coincidence that this profile matches that of defendant is probative of his guilt in the same manner as if he had owned shoes that matched a foot imprint found at the crime scene. It was up to the jury to weigh the probative value of that evidence in light of the fact that a significant number of other individuals may possess the same profile.
>
> [Id. at 152.]

---

[12] As in this case, Szymkowiak was the expert.

Likewise, here, we are satisfied the Y-STR DNA expert testimony was relevant and had probative value because it showed defendant could not be excluded from the class of individuals who could have contributed the biological material found on the victim's underwear. Relevant evidence is that which has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Under N.J.R.E. 401, "[e]vidence need not be dispositive or even strongly probative in order to clear the relevancy bar," State v. Buckley, 216 N.J. 249, 261 (2013), and "if evidence . . . support[s] the existence of a specific fact, even obliquely, it is relevant and admissible." Verdicchio v. Ricca, 179 N.J. 1, 34 (2004).

"Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible, unless exclusion is warranted under a specific evidence rule." State v. Burr, 195 N.J. 119, 127 (2008). N.J.R.E. 403 is one such exclusionary rule, "mandat[ing] the exclusion of evidence that is otherwise admissible 'if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.'" State v. Cole, 229 N.J. 430, 448 (2017) (quoting N.J.R.E 403)).

Defendant asserts Szymkowiak's testimony, particularly his statistical conclusions, had "limited probative value" and "was substantially outweighed by the risk of confusing and misleading the jury" as evidenced by the fact that the jury requested a play-back of the expert's cross-examination. However, we are satisfied the testimony was not confusing or misleading, but simply reflected the inherent limitations of Y-STR DNA analysis, limitations that Szymkowiak explained during his testimony. Moreover, any deficiencies in Szymkowiak's testimony went to the weight to be given to the testimony, not its admissibility. Indeed, defense counsel capitalized on the limitations of Y-STR DNA analysis by arguing in summations that "there [were] significant problems with the sample, the testing, and the statistical evaluation of th[e] evidence," and that Szymkowiak's finding was not "definitive" and was not "reliable."

The weight to be given expert testimony is within the purview of the trier of fact. State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004). "It may well be that a jur[y] will refuse to accept scientific testimony which it cannot understand; however, that does not affect admissibility but only the weight that such testimony will be given." State v. Williams, 252 N.J. Super. 369, 377 (Law Div. 1991); see Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 284 (1990) ("[U]nreliable methods of forming an opinion affect the weight of expert

testimony but not its admissibility."); see also State v. Koedatich, 112 N.J. 225, 242, 245 (1988) (upholding admission of evidence of matching fibers even though manufacturers produced hundreds of yards of such fibers in a given year because the quantity of the fibers went to the weight, not the admissibility, of the evidence).

In addition, in the final charge, the judge instructed the jury:

> You are not bound by [the] expert's opinion, but you should consider each opinion and give it the weight to which you deem it is entitled, whether it be great or slight, or you may reject it.
>
> . . . .
>
> The value or weight of the opinion of the expert is dependent upon and is no stronger than the facts on which it is based. . . .  You may . . . determine from the evidence in the case that the facts that form the basis of the opinion are true, are not true, or are true in part only, and in light of such findings you should decide what effect such determination has upon the weight to be given to the opinion of the expert.

The judge gave a similar instruction at the conclusion of Szymkowiak's testimony.

Moreover, following the play-back of Szymkowiak's cross-examination and re-direct examination, the jurors had no further questions or requests, suggesting that they were not confused to such a degree that it impeded their

ability to render a verdict. See State v. McClain, 248 N.J. Super. 409, 421 (App. Div. 1991) ("The failure of the jury to ask for further clarification or indicate confusion [after readback of jury charge] demonstrates that the response was satisfactory.").

In sum, we find no error in the admission of Szymkowiak's expert testimony. Even if there was error, we are satisfied the error was not "clearly capable of producing an unjust result," given the substantial evidence of defendant's guilt. R. 2:10-2. In that regard, the victim gave consistent accounts of the incident, accounts that were corroborated by her brother's fresh complaint testimony as well as the testimony of Lane, who observed defendant coming from the area of the house where L.M.'s bedroom was located at the time in question. As a result, any erroneous admission of Szymkowiak's expert testimony did not rise to the level of plain error. See State v. Sowell, 213 N.J. 89, 107-08 (2013) (affirming conviction given strength of evidence against defendant despite admission of improper expert testimony).

IV.

In Point III, defendant argues the judge erred in rejecting his request to redact "prejudicial hearsay" from his custodial interview before the statement was presented to the jury. According to defendant, the challenged remarks

include the interrogators' comments that "[defendant's] friends believed he was guilty," as well as comments that defendant claims "impermissibly bolstered L.M.'s credibility." Defendant further asserts that the limiting instruction given by the judge failed to "cure[]" the error.

Defense counsel asked the judge to redact the portions of defendant's statement in which the interrogators referred to defendant's friends' opinions of his guilt and L.M.'s consistent repetition of her "story." As to the former, Brazile asked defendant why Hicks was "apologizing" to the victim "for [defendant's] actions" and commented that defendant's "boy even believe[d] that [he] did it." As to the latter, Brazile stated the victim told the same story "[four] times" and did not "over embellish" or "make it extreme," implying that the victim was credible.

In denying counsel's request, the judge stated:

> It appears that defendant is seeking to redact . . . any statements the detectives attribute to the victim or to Mr. [Hicks] or anyone else in the course of their investigation.
>
> I don't think there's anything inappropriate about an interrogation tactic that draws upon information allegedly uncovered in the course of the investigation. And the defense cites to no case law that stands for the opposite proposition.

However, the judge agreed to give a limiting instruction and gave the jury the following instruction prior to playing the statement and in the final charge:

> Over the course of the interview, you may hear officers make reference to various statements allegedly given to them by certain persons. You should not consider these statements as attributed to others by the officers conducting the interview as proof or evidence of those persons' actual thoughts or beliefs, nor are those statements offered for the truth of the matters asserted in those statements.

> Credibility determinations are made by you and you alone and should be made by you after you have had an opportunity to see and hear the statements and/or testimony of the person or persons who allegedly made such statements attributed to them by the officers.

Defense counsel did not object to the limiting instruction. The judge also instructed the jury: "[I]f I gave a limiting instruction as to how to use certain evidence, that evidence must be considered by you for that purpose only. You cannot use it for any other purpose."[13]

Defendant argues the judge abused his discretion in denying his request to redact the objectionable portions of defendant's statement. "[A] trial court's

_____

[13] Defendant also raised the judge's failure to redact the objectionable statements in his motion for a new trial. In denying the motion, the judge concluded "the inclusion of the[] statements" did not "constitute a manifest denial of justice," and noted the limiting instruction "specifically addressed defendant's . . . concerns."

evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting Marrero, 148 N.J. at 484).

Applying that standard of review, we agree the comments were objectionable. Although officers' statements during the interrogation of a suspect may often be relevant for the limited, non-hearsay purpose of giving context to a suspect's responses, through the statements, the officers essentially conveyed to the jury the opinion that defendant's friends believed he was guilty and the victim was credible based on her consistent repetition of her story. "That is not allowed." State v. Frisby, 174 N.J. 583, 593-94 (2002).

However, we are persuaded that the judge's limiting instructions cured any prejudicial error in the interrogators' statements. Prejudice may be cured by the court "delivering a timely and effective limiting instruction." State v. Jackson, 211 N.J. 394, 413 (2012). "Through a limiting instruction, the jury should be

told the permissible and prohibited purposes of the evidence." State v. Scharf, 225 N.J. 547, 581 (2016).

Here, the jury was instructed to "not consider the[] statements . . . as proof or evidence of those person[]s['] actual thoughts or beliefs, nor . . . for the truth of the matters asserted in th[e] statements." The jurors were also told they were the sole judges of credibility and they should only make credibility assessments after they "had an opportunity to see and hear the . . . testimony of the . . . persons who allegedly made such statements." Additionally, the judge told the jurors they were to adhere to the limiting instructions given during the trial. "There can be no assumption that the jury did not faithfully follow the admonition." State v. Manley, 54 N.J. 259, 271 (1969); see State v. Burns, 192 N.J. 312, 335 (2007) ("One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions.").

V.

In Point IV, defendant argues, "[e]ven if the [c]ourt does not find that any one error alone warrants a new trial," the cumulative effect of the purported errors deprived him of a fair trial. "We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient

32

doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). However, here, because we conclude there were no reversible errors either alone or combined, defendant's cumulative error argument must also fail.

VI.

In Point V, defendant challenges his aggregate ten-year NERA sentence,[14] arguing the judge "abused [his] discretion" by applying aggravating factors that were "not supported by the record." Defendant also asserts the judge "did not engage in the proper analysis" in imposing the maximum $1000 SCVTF penalty.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts.'" State v. Cuff, 239 N.J. 321, 347 (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

---

[14] The judge sentenced defendant to a ten-year term of imprisonment, subject to NERA, on the second-degree sexual assault conviction and merged the endangering conviction into the sexual assault conviction.

> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting
> State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, the judge found aggravating factors three and nine.[15] See N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense); N.J.S.A. 2C:44-1(a)(9) (the need to deter defendant and others). Regarding aggravating factor three, the judge cited defendant's classification in the Adult Diagnostic and Treatment Center evaluation[16] as an "average risk" for sexual recidivism, and defendant's statement in the pre-sentence report that "he had consumed alcohol[17] and marijuana on a daily basis before his incarceration." Regarding aggravating factor nine, the judge found the need to deter was heightened by the circumstances of the offense as well as "the fact that notwithstanding the jury's verdict, [defendant] continues to deny that he committed any offense and remains . . . unrepent[ant]."

---

[15] The judge found no mitigating factors.

[16] See N.J.S.A. 2C:47-1 (requiring the completion of "a psychological examination" of persons convicted of designated sex offenses to determine "whether the offender's conduct was characterized by a pattern of repetitive, compulsive behavior").

[17] Defendant had a prior conviction for driving while intoxicated, N.J.S.A. 39:4-50.

Defendant argues the judge erred in considering his refusal to acknowledge guilt and in engaging in impermissible double counting of the elements of the offense in finding aggravating factor nine. First, we discern no impermissible double counting. Further, in State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991), we held the trial court properly found aggravating factor nine given the defendant's "consistent denial of involvement and his lack of remorse . . . ." See also State v. Carey, 168 N.J. 413, 427 (2001) (finding the defendant's denial of responsibility for the crime "does not irrefutably prove that defendant is likely to reoffend, but it does provide support for the trial court's conclusion"); cf. State v. Marks, 201 N.J. Super. 514, 539-40 (App. Div. 1985) (noting in dicta that a defendant's refusal to express remorse and acknowledge guilt following conviction is "generally not a germane factor in the sentencing decision"). Defendant also asserts the judge erred in finding aggravating factor three based on his marijuana and alcohol use. However, in State v. N.A., 355 N.J. Super. 143, 154-55 (App. Div. 2002), we held a "history of poly-substance abuse" supported a finding that the defendant "would commit another crime . . . ."

Finally, defendant contends, and the State concedes, that the judge erred in applying the maximum SCVTF penalty without the requisite analysis. Under

N.J.S.A. 2C:14-10(a)(2), "a person convicted of a [second-degree] sex offense . . . shall be assessed a penalty" for that offense "not to exceed" $1000. In imposing such a penalty, the trial court should consider "the nature of the offense" and "the defendant's ability to pay the amount assessed." State v. Bolvito, 217 N.J. 221, 233-34 (2014). "[A] defendant's ability to pay should not be measured only by current circumstances, but assessed over the long term." Id. at 234. In addition, the court "should provide a statement of reasons" for the assessed penalty to "facilitate appellate review." Id. at 235. Because the judge failed to comply with these requirements, we remand for a statement of reasons to support the imposition of the SCVTF penalty. Accordingly, we affirm the convictions and sentence, but remand for a statement of reasons to support the imposition of the SCVTF penalty.

Affirmed in part; remanded for a statement of reasons to support the imposition of the SCVTF penalty. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2574-18